UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA
ex rel. MICHAEL WINKLER,                                    Case No. 10-cv-13558

                        Plaintiff,                          Paul D. Borman
v.                                                          United States District Judge


BAE SYSTEMS, INC.,

                        Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (ECF NO. 22)

        Before the Court is Defendant BAE Systems, Inc. ("BAE") Motion to Dismiss.  (ECF No.

22.)  Plaintiff filed a response (ECF No. 25) and BAE filed a reply (ECF No. 26).  The Court held

a hearing on March 27, 2013.  For the reasons that follow, the Court GRANTS the motion to

dismiss.

**INTRODUCTION**

        This is a *qui tam* action brought by Plaintiff-Relator Michael Winkler ("Plaintiff," "Relator,"

or "Winkler") pursuant to the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* against

Defendant BAE Systems, Inc. ("BAE"), alleging that BAE submitted false claims for payment to

the United States Army in connection with the sale to the Army of Family of Medium Tactical

Vehicles ("FMTVs").  "The FCA is an anti-fraud statute that prohibits the knowing submission of

false or fraudulent claims to the federal government."  *United States ex rel. Bledsoe v. Community

Health Systems, Inc.*, 342 F.3d 634, 645 (6th Cir. 2003) ("*Bledsoe I*") (statutory citation omitted).

The FCA, as part of its enforcement mechanism, permits a private party, known as a "relator," to

1

file suit alleging FCA violations on behalf of the government.  Section 3730(b)(2).  A *qui tam* complaint filed by a relator is filed and remains under seal for a period of sixty days, during which time the government may elect to intervene.  *Id*.  If the government elects not to intervene, as the Government has done in the instant case, the relator may proceed with the suit and, if successful in recovering funds, is entitled to 25-30% of the recovery.  Section 3730(d)(2).

BAE denies having submitted any false claims to the United States Government in connection with FMTVs  but addresses the sufficiency of the allegations of the Complaint and argues that Plaintiff has failed to state his FCA claims with the requisite particularity under Fed. R. Civ. P. 9(b) and additionally argues that Plaintiff fails to state a claim for relief under Fed. R. Civ. P. 12.  For the reasons that follow, the Court GRANTS the Defendant's motion and DISMISSES the Complaint.[1]

## I.      BACKGROUND

Relator filed his *qui tam* Complaint in this action under seal on September 7, 2010.  (ECF No. 1, Sealed Complaint.)  On February 7, 2012, the United States gave notice declining to intervene and proceed with this action and suggesting the unsealing of the Complaint.  (ECF No. 10.)  On February 8, 2012, this Court entered an Order unsealing the Complaint and further ordering that the Complaint be served upon the Defendant.  (ECF No. 11.)  Pursuant to the Court's February 8, 2012 Order, any other matters previously sealed by the Court remain under seal.  (*Id*.)

---

[1] The statutory requirement that the government consent to any dismissal of a pending *qui tam* case does not apply to involuntary dismissals.  *United States ex rel. Laucirica v. Stryker Corp.*, No. 09-cv-63, 2010 WL 1798321, at *1 n.1 (W.D. Mich. May 3, 2010) ("U.S.C. § 3730(b)(1) provides that '[t]he action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.' However, the requirement of government consent does not apply to involuntary dismissals."  (citing *Minotti v. Lensink*, 895 F.2d 100, 103 (2d Cir.1990); *Shaver v. Lucas Western Corp*., 237 F.3d 932, 934 (8th Cir.2001)).

The *qui tam* Complaint alleges that Plaintiff, who joined BAE at its Sealy, Texas plant in 2008 as an Integrated Logistics Support ("ILS") Manager, discovered that the braking system designed by BAE for its FMTVs contained a latent defect that could reduce the vehicle's braking power, cause the brakes to fail the minimum performance standards set forth in the contracts, and render the vehicles unsafe to operate.  (Compl. ¶¶ 5, 8.)  The Complaint alleges that in June, 2008, the United States Army Tank-Automotive and Armaments Command Life Cycle Management Command ("TACOM LCMC"), and its constituent TACOM Contracting Center, awarded BAE a contract to supply up to 10,000 FMTVs. (Compl. ¶ 18.)  According to the Complaint, the June 2008 Contract incorporated a lengthy set of product specifications, the System Specification, Family of Medium Tactical Vehicles ("System Specifications").  (Compl. ¶ 19.)  The System Specifications incorporated by reference the Federal Motor Vehicle Safety Standard ("FMVSS").  (Compl. ¶ 20.)

The FMVSS sets performance standards for air brake systems for trucks, buses and trailers and sets forth stopping distance and side swerve tolerances.  (Compl. ¶¶ 21-22, quoting 49 C.F.R. §§ 571.121 S5.3, 5.3.1, 5.3.6.)  Additionally, according to the allegations of the Complaint, the Government contracts with BAE contain detailed product specifications that set forth performance requirements for the FMTVs.  (Compl. ¶ 23.)  The System Specifications also direct that BAE is responsible for the correction of all defects on the FMTVs and define a "major defect" as "any defect that could affect safety, or that will likely result in decreased vehicle performance, mission failure, reduced operational capability, or result in a loss of function to any major component or sub-system (i.e. . . . brakes . . . etc.)."  (Compl. ¶¶ 24, 25 (quoting System Specifications ¶ 4.4.2.2.1).)

The System Specifications also required that each FMTV model have a maintenance ratio no greater than between 5,000 to 12,000 mean miles between hardware failures and from 0.0012 to

0.0094 maintenance man-hours per operating mile.  (Compl. ¶ 27 (quoting System Specifications, ¶ 3.2.4, Table 1).)  Plaintiff also alleges, on information and belief, that pursuant to the Federal Acquisition Regulation ("FAR") 32.908(c), that the June, 2008 Contract between BAE and the Army incorporated FAR 42.232-25 which stated that if a contractor becomes aware of an overpayment to it by the Government, it must notify the Contracting Officer immediately and make arrangements  to address the overpayment.  (Compl. ¶ 28.)

The BAE-built FMTVs use an "air over hydraulic brake system," which BAE designed to accommodate FMTV design changes resulting in increased front axle loads.  The Complaint describes the brake system of the FMTVs as follows:

> The design uses two identical, but independent brake mechanisms - one for each front wheel.  In each of the systems, the diaphragm is mounted between a fixed housing and a movable plate.  As compressed air is released into the diaphragm, it inflates, moving the plate and forcing the piston into a chamber filled with hydraulic fluid.  As the piston moves into the chamber, it drives the hydraulic fluid out of the chamber, through the brake line, and to the wheel ends, where it activates the brakes (by causing the brake shoe to engage with the brake drum).  When the driver releases the air in the diaphragm, the diaphragm deflates.  A spring in the hydraulic chamber forces the piston out of the chamber (which pushes the plate back against the deflating diaphragm), creating a vacuum that draws the hydraulic fluid back from the brake line into the hydraulic chamber, releasing the brakes.

(Compl. ¶ 31.)

The Relator alleges that on or before June 10, 2009, BAE discovered two serious problems with its FMTV brake systems.  (Compl. ¶ 32.)  The Complaint alleges that BAE disclosed to the Government that there was a "manufacturing process" issue but did not inform the Government of the specifics of the problem,  or the consequences of the problem.  The Complaint alleges that, as a result, there were two "significant dangerous problems that BAE discovered," of which the Government was not made aware.  (Compl. ¶ 32.)  According to the Relator's Complaint, both

4

problems first arise when the FMTVs undergo ordinary maintenance procedures.

First, when the hydraulic chamber in the air brake system is filled with hydraulic fluid in the course of ordinary maintenance, called "bleeding the brakes," the system is designed such that air bubbles are introduced into the hydraulic chamber.  Those air bubbles act like a cushion, preventing the complete transfer of pressure to the wheels of the FMTV.  This results in decreased braking power and increased stopping distances.  Additionally, this introduction of air bubbles into the hydraulic chamber is inconsistently distributed between the two independent hydraulic systems for each front wheel, resulting in uneven braking power and vehicle "swerving," i.e. pulling to one side, during braking.  (Compl. ¶¶ 33-34.)

Second, and related to the first problem described by the Relator, because the air in the hydraulic chamber results in reduced braking power, the driver of the vehicle is required to apply more pressure to the brakes, leading to "over-stroke," or excessive extrusion of the piston into the hydraulic chamber.  The Complaint alleges that in FMTVs manufactured prior to August 2009, this could result in the dislodging of the spring that causes the piston to return to its idle position (non-braking) position, or, if the pressure applied is great enough, the check valve could be compressed causing it to extrude into the hydraulic brake line, leading to complete blockage of one brake line. This would result in the complete loss of brake function in one wheel making steering difficult if not impossible.  (Compl. ¶ 35.)

According to the Complaint, when BAE discovered these problems in or before June, 2009, it did not inform the Government but began working on maintenance and design solutions to the problem.  Relator and another logistics engineer met with two BAE engineers who presented a power point presentation addressing the "Effects of Air Entrapment in A1P2 Hydraulic Brake

Circuits." (Compl. ¶¶ 36-37, Exhibit A, FMTV A1P2 Air Over Hydraulic Brake System Recommendations By H. Bartels, June 10, 2009.) The Power Point presentation described the effects of the air entrapment, which included increased stopping distances, varying steer input and "significant pull," and damage to the hydraulic converter from over-stroking. (Compl. ¶ 38.) The presentation further stated that a driver with "foreknowledge," i.e. who knew and expected an uneven loss of braking power, "was able to correct and maintain lane." (Compl. ¶ 38, Ex. A p. 6.) The presentation also noted that the "converter over-stroke" problem was the most serious condition and if encountered would render the FMTV "not safe to operate at all speeds." (Compl. ¶ 39, Ex. A, p. 8.) The presentation further notes that the risk of over-stroke can be reduced by utilizing a new converter design that can permit the presence of air and not suffer damage. (Ex. A, p. 8.) According to the Complaint, BAE intended to, but had not as of the date of the power point presentation, implemented the new converter design in production. (Compl. ¶ 40.)

The Complaint alleges that the new converter design that was intended to address the over-stroke problem, did not address the air-bubble problem that resulted from bleeding the brakes during routine maintenance. The presenters of the power point presentation, BAE engineers Bartels and Newbry, told Relator that they believed the air-bubble problem was the result of the procedures employed to bleed the brakes and instructed Relator and logistics engineer Knight to draft a maintenance procedure that could be followed to prevent the introduction of air into the hydraulic chamber. (Compl. ¶ 41.) According to the Complaint, Bartels instructed Relator not to disclose the issue to the Government because BAE was taking the position that the issue was just a maintenance procedure and not an issue with the design of the brake system. (*Id.*) Relator and Knight, along with other BAE technical writers, mechanics and engineers, attempted for two months to design a

6

maintenance procedure that would not introduce the air bubbles during brake bleeding but were unable to come up with a maintenance solution that would prevent the problem. (Compl. ¶ 42.) According to Relator, in July, 2009, when the Government personnel visited BAE, Jim Panatano, the BAE Program Manager, again instructed Relator not to disclose to the Government any of the problems with the FMTV air brakes. (Compl. ¶ 43.)

According to the Complaint, in or around August, 2009, BAE began manufacturing FMTVs with modified components including a design fix for the over-stroke problem. According to Relator, BAE did not update the FMTV design specifications that accompanied the sale of some 5,000 FMTVs (each of which Relator alleges had the design flaw that caused the air bubble and over-stroke problems) to the Army, 2,000 of which were delivered after BAE discovered the air-brake system problems, placing the Government in the position of ordering replacement parts, when necessary, that were obsolete and dangerous and not the redesigned components that BAE commissioned to correct the over-stroke problem. (Compl. ¶ 44-47.) The Complaint alleges that BAE's 2009 design change did not address the underlying problem of air bubbles in the hydraulic chamber following routine maintenance, i.e. brake bleeding. (Compl. ¶ 46-47.)

Relator alleges that as a result of the design flaws in the FMTVs that were delivered to the Government pursuant to the June, 2008 contract, those FMTVs can not meet FMVSS 121 (System Specification ¶ 2.1-2.2.1) stopping-distance and lane-hold standards after they have undergone standard maintenance. (*Id.*) In addition, Relator alleges, each FMTV that was delivered to the Government violated the terms of the June 2008 Contract by (1) failing to meet multiple System Specification standards for brakes; (2) failing to be free of all recurring major defects, including defects in the brake system; (3) failing to maintain the requisite minimum maintenance ratios set

forth in the System Specification, including the minimum mean miles between hardware mission failure. (Compl. ¶ 48.)

Relator concludes as a result of the above, that each "invoice, statement, voucher, or request for payment that BAE submitted to the Government for the manufacture or delivery of FMTVs under the contract awarded in June 2008 was a representation of conformance to the regulatory and contractual requirements described [in the Complaint]. Each such invoice, statement, voucher, or request for payment was false," as it was impossible for BAE to certify that the vehicles met the FMVSS standards of the parties contractual agreement. (Compl. ¶ 49.) Additionally, Relator alleges that each invoice, statement, voucher, or request for payment that BAE submitted to the Government for the manufacture and delivery of FMTVs under the June 2008 Contract was a representation of compliance with BAE's contractual obligation to disclose to the Government all overpayments. (Compl. ¶ 50.) Relator alleges that BAE became aware of the problems with the FMTV brake systems at some time prior to June, 2009 and that therefore each invoice to the Government after that date was a knowingly false claim within the meaning of the FCA. (Compl. ¶ 51.)

## II.   STANDARD OF REVIEW

On a motion to dismiss, a complaint alleging false and fraudulent claims for payment in violation of the FCA must meet the pleading standards of both Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 9(b). *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 645 (6th Cir. 2003) ("*Bledsoe I*"). In *Bledsoe I*, the Sixth Circuit dispelled any notion that a FCA suit might escape the pleading strictures of Rule 9(b), noting that the FCA was originally enacted to combat the "massive frauds perpetrated by large contractors

8

during the Civil War," and was at its heart an "anti-fraud" statute. *Bledsoe I*, 342 F.3d at 641 (quoting *United States v. Borstein*, 423 U.S. 303, 309 (1976) and *Gold v. Morrison-Knudsen Co*., 68 F.3d 1475, 1476 (2d Cir. 1995)).

## A.     Federal Rule of Civil Procedure 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id*. at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more

9

> than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"
> *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

## B.   Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) requires that "in any complaint averring fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). In the specific context of a claim under the FCA, "a complaint alleging [a FCA] claim must state the circumstances surrounding the FCA violation with particularity." *Bledsoe I*, 342 F.3d at 642-43. The *qui tam* complaint must "identify

10

specific parties, contracts, or fraudulent acts" and may not "rely upon blanket references to acts or omissions by all of the 'defendants.'"   *Id.* at 643 (internal quotation marks and citations omitted). In analyzing the pleading sufficiency of an FCA claim, Rule 9(b) "'is to be interpreted in conjunction with Federal Rule of Civil Procedure 8,' [which requires] a 'short and plain statement of the claim.'"   *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (quoting *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) ("*Bledsoe II*")).  The Sixth Circuit has instructed that Rule 9(b)'s requirements "should not be . . . decoupled from the general rule that a pleading must only be so detailed as is necessary to defend against the pleading's claims."  *United States ex rel. SNAPP, Inc. v. Ford Motor Co*., 532 F.3d 496, 504-05 (6th Cir. 2008).  Notwithstanding the Court's obligation to consider the application of both Rule 8 and Rule 9(b), the Sixth Circuit has outlined what a relator must allege to satisfy Rule 9(b) in the context of a *qui tam* complaint:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place for each such statement and the person responsible for making (or in the case of omissions, not making) same, and (3) the content of such statements and the manner in which the misled [the government], and (4) what the defendant obtained as a consequence of the fraud.

*Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 877 (6th Cir. 2006).  Finally, a *qui tam* Complaint must be construed "in the light most favorable to the plaintiff [] accepting all factual allegations as true [to] determine whether the claim contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  Thus, a FCA complaint that fails to comply with Rule 9(b)'s pleading requirements fails to state a claim under Rule 12(b)(6).

## III.   ANALYSIS

Relator Winkler seeks to establish BAE's liability under four separate sections of the FCA:

11

Section 3729(a)(1)(A), which penalizes a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" (the "presentment claim"); section 3729(a)(1)(B), which penalizes a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" (the "false statement claim"); section 3729(a)(1)(C), which penalizes a person who "conspires to commit a violation of subparagraph (A) or (B)" (the "conspiracy claim"); and section 3729(a)(1)(G), which penalizes a person who "knowingly makes . . . a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids . . . an obligation to pay . . . to the Government" (the "reverse false claim").[2]

> **A.      Winkler Has Not Sufficiently Pled Either a False Claim or Presentment of a False Claim as Required to Prevail on a Claim of False Presentment Under Section 3729(a)(1)(A).**

In *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007) ("*Bledsoe II*"), the Sixth Circuit clarified that a relator must identify specific false claims with particularity, and cannot just aver the existence of a fraudulent scheme, holding that "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)." *Id*. at 504.  In the context of the FCA, then, the *qui tam*

---

[2] The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009), amended and renumbered several FCA provisions.  Relator in this case seeks to proceed under the amended FERA provisions, as indicated in his Single Count Complaint, entitled "Count I 'False Claims Act'" claim under 31 U.S.C. §§ 3729(a)(1)(A)-(C), (G)."  These are the renumbered sections for §§ 3729(a)(1), (2), (3) and (7) respectively.  With two exceptions not applicable here, the FERA amendments take effect on the date of enactment and apply to all conduct on or after the date of enactment, i.e. May 20, 2009.  FERA § 4(f).  The parties appear to acknowledge that the conduct complained of in Winkler's Complaint occurred after the May 20, 2009 enactment date of FERA.  *See* Compl. ¶ 32 (alleging that BAE first discovered the FMTV brake issues in June, 2009).

complaint "must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government – or, in the locution of [the Sixth Circuit's] decision of *Sanderson*, the fraudulent claim is the *sine qua non* of a False Claims Act violation." *Id*. at 504 (internal quotation marks and citation omitted). In so holding, the Sixth Circuit expressly rejected the reasoning of other courts finding sufficient particularity in allegations of systematic fraudulent schemes spanning the course of several years that allegedly gave rise to a belief that false claims had been submitted. *Id*. at 505 n.13.

Thus, the allegations of the *qui tam* complaint "must specifically allege the essential elements of fraud that constitute a violation of the [FCA] statute," which necessarily include "time, place and content" of the alleged misrepresentation. *Id*. at 505. Because the "false claim" itself is a requirement of the cause of action, it is not sufficient that the complaint allege the underlying fraudulent conduct with particularity – the complaint must also allege the presentation of a false claim for payment to the government with the same particularity. *Id*. Finally, "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme," those examples may suffice where they are "*representative samples* of the broader class of claims." *Id*. at 510 (emphasis in original).

Rule 9(b) does not "permit a False Claim Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that the claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 877 (6th Cir. 2006). "[B]ecause the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to

13

the 'claim for payment,'" (*United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)), the FCA Complaint must contain specific allegations that the defendant "knowingly ask[ed] the Government to pay amounts it d[id] not owe." *Sanderson*, 447 F.3d at 877. Presentment of the fraudulent claim itself is "the *sine qua non*" of a FCA claim. *Id*. at 878 (quoting *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). "A 'claim' at least requires a request or demand . . . for money or property." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 447 (6th Cir. 2008).

In *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 2008) (*SNAPP I*), the Sixth Circuit affirmed the district court's dismissal of a *qui tam* complaint that failed to plead even a single false claim with particularity, but vacated the district court's decision denying SNAPP's motion to amend and remanded with instructions to the district court to consider SNAPP's proposed amended complaint in light of the Sixth Circuit's holding in *Bledsoe II* that certain "complex and far reaching schemes" may be pleaded by means of "characteristic" or "illustrative" examples. 532 F.3d at 506. On remand, the district court again concluded that the amended complaint failed to plead a false claim, holding that "the 'listing' of sixty five contracts between Ford and the government did not then and does not now provide [the] Court with any evidence as to even a single *claim for payment* made by Ford to the government . . . ." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, No. 06-11848, 2009 WL 960482, at *9 (E.D. Mich. April 7, 2009) (emphasis in original). The amended complaint alleged that the government had awarded certain contracts to Ford based on Ford's allegedly fraudulent conduct and listed the dollar value of each allegedly fraudulently procured contract. The district court rejected the relator's argument that the contracts evidenced requests for payment as required by the FCA:

> Nothing in *Bledsoe II* makes a "listing" of contracts awarded to Ford, the value of the contracts, and the number of vehicles awarded to Ford the same as a "request or demand, whether under a contract or otherwise, *for payment*." *See* 31 U.S.C. § 3729. . . . Moreover, the listing does not describe the information included in it as being funds actually paid by the government to Ford, but rather, only as the "value of the contract." In short, the contracts SNAPP relies on are not the specific or characteristic examples of Ford's claims for payment which are required under *Bledsoe II*.

2009 WL 960482, at *8, 9 (emphasis in original). The Sixth Circuit affirmed the district court in *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505 (6th Cir. 2010) (*SNAPP II*), clarifying that "none of the holdings of *Bledsoe II* alter the requirement that at least one claim be pleaded with specificity, or provide support for the argument that a contract-even an especially well-identified one-is a "claim" within the meaning of the FCA." *Id.* at 514.

Similarly, in *Chesbrough, supra*, the Sixth Circuit had occasion to revisit and rely on its decisions in *Bledsoe II, Sanderson, SNAPP II* and *Marlar*, to dismiss a FCA complaint that failed to plead with particularity that the allegedly false scheme there resulted in the actual presentment of false claims to the government for medicare reimbursement. The relators in *Chesbrough* alleged that the defendant submitted claims to the government for, among other things, certain tests that were nondiagnostic and allegedly of no medical value and attached copies of 5 studies allegedly representative of the claims. *Id.* at 470. The Sixth Circuit held that, although the relators had alleged a fraudulent scheme with respect to such studies, they failed to allege with particularity any billings for those tests that were actually submitted to the government, and their lack of personal knowledge of the defendant's actual billing practices was fatal to any inference which might arise from the studies themselves:

> In *Bledsoe*, *Sanderson*, and *Marlar*, we imposed a strict requirement that relators identify actual false claims. The Chesbroughs have no personal knowledge that claims for nondiagnostic tests were presented to the government, nor do they allege

15

facts that strongly support an inference that such billings were submitted. We therefore conclude that the Chesbroughs' complaint fails to satisfy Rule 9(b).

655 F.3d at 472.

### 1.    Winkler fails to allege a false or fraudulent scheme.

As relevant to his presentment claim, Winkler must allege "a scheme that constitutes fraud within the within the meaning of the FCA." *Chesbrough*, 655 F.3d at 467. To establish his claim that the brake maintenance issues described in his Complaint sufficiently allege a false or fraudulent scheme under the FCA, Winkler relies on a false certification theory of liability. The exact contours of this theory were discussed by the Sixth Circuit in *Chesbrough*:

> There are situations in which a [claimant's] failure to comply with regulations can make claims submitted to the government "fraudulent" within the meaning of the FCA. This theory of liability is referred to as "false certification." *United States ex rel. Willis v. United Health Grp.*, 659 F.3d 295, 304 (3d Cir. 2011). When a claim expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply would render the claim fraudulent. *See Mikes [v. Straus]*, 274 F.3d [687], 697–99 [(2d Cir. 2011)].

> The Chesbroughs, however, do not argue that VPA expressly certified that its studies complied with industry standards. Rather, they contend that, in submitting claims, VPA impliedly certified that the studies for which it billed met those standards. In *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002), this court adopted the "implied certification" theory of liability, holding that "liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Ibid*. Under that theory, it is not the violation of a regulation itself that creates a cause of action under the FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment. Thus, a relator cannot merely allege that a defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment.

655 F.3d at 467-68.

Winkler can not attempt to rely on an express false certification as there is no indication that BAE affirmatively certified to the Government anything concerning the performance of the FMTV's

16

brake system following routine maintenance. Winkler argues instead that the facts alleged in his Complaint articulate an implied false certification theory. The implied false certification theory "is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001). Discussing the implied false certification theory in *Chesbrough*, the Sixth Circuit confirmed that the *sine qua non* of such a theory is the express conditioning of payment on compliance with a specific statute or regulation. The Sixth Circuit in *Chesbrough* relied heavily on the Second Circuit's opinion in *Mikes, supra*. In *Mikes*, the Second Circuit reasoned that "it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay," and joined the Fourth, Fifth, Ninth and D.C. Circuits "in ruling that a claim under the Act is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment." *Id*. at 697. The Second Circuit further observed, specifically with respect to the implied false certification theory, that "[a]n implied false certification claim is based on the notion that the act of submitting a claim for [payment] itself implies compliance with governing federal rules that are a precondition to payment. " 274 F.3d at 697, 699. Rejecting the notion that requiring compliance as precondition to payment engrafted a materiality requirement onto the FCA, the Second Circuit in *Mikes* simply recognized that not all allegations of regulatory, statutory or contractual non-compliance "will cause a claim to be false." *Id*. at 697. Only those allegations that contain facts that condition the government's payment on the defendant's compliance with a statutory, regulatory or contractual provision will suffice to state an implied false certification theory of liability. The Sixth Circuit has reaffirmed the holding of *Chesbrough* on the issue of implied false certification, noting that the theory "only applies where

17

the underlying regulation is a 'condition of payment,' meaning that the government would not have paid the claim had it known the [claimant] was not in compliance." *U.S. ex rel. Hobbs v. MedQuest Assoc., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013).

Winkler argues that under the terms of the 2008 contract, BAE was to produce a product that met certain specific requirements detailed in the System Specifications, and by incorporation, certain federal guidelines.  (ECF No. 25, Pl.'s Resp. 14.)  Winkler further argues that because the FMTVs that were delivered to the government under the 2008 contract failed to meet these specifications after their first scheduled maintenance, Defendant knowingly sold nonconforming products to the Government and each product sold was a false claim.  (*Id.*)  The Complaint alleges that these acts induced the Government to approve and pay "such false claims," and that the Government would not have paid the claims "but for" BAE's illegal conduct.  (Compl. ¶¶ 55, 58.)  The Complaint does not allege, however, the critical fact, i.e. that any statute, regulation or contractual provision expressly stated that compliance with the stated standards by BAE was "required to obtain payment."  Plaintiff does not cite any statute, regulation or contractual provision that "expressly states" that compliance with any particular standard or provision is a precondition to payment.  As the Sixth Circuit noted in *Chesbrough*, under the implied false certification theory, "it is not the violation of a regulation itself that creates a cause of action under the FCA. Rather, noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment. Thus, a relator cannot merely allege that a defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment."  655 F.3d at 468.

Winkler's Complaint falls far short of alleging an implied false certification theory of liability.  The Complaint contains no allegations whatsoever that would support the necessary

18

finding that BAE's compliance with some statutory, regulatory or contractual provision relating to the performance of the FMTVs after first maintenance was a condition of the government's payment of a claim. The Complaint alleges that the June 2008 Contract (which notably is not attached to the Complaint) incorporated a lengthy set of detailed product specifications, the System Specifications, and that those System Specifications in turn incorporated by reference the FMVSS that is codified in the Code of Federal Regulations. Finally, the Complaint alleges that the 2008 Contract itself contained certain performance requirements for the FMTVs and placed upon BAE the obligation to correct defects found in the FMTVs. (Compl. ¶¶ 19, 20, 23, 24.) Importantly, the Complaint does not allege, and Plaintiff's response does not argue, that compliance with any of these specifications, regulations or contract provisions was a precondition of payment for the FMTVs. The Complaint does not attach the 2008 Contract and contains no allegations regarding any of the payment terms under that Contract. In fact, the Contract appears to contemplate the Government's acceptance and payment for non-conforming vehicles in that it places the obligation for correcting defects found on the FMTVs squarely on BAE. (Compl. ¶ 24.)

Even assuming, as Plaintiff's Complaint alleges, that BAE delivered FMTVs that would become non-conforming after first maintenance, and failed to inform the Government of the alleged potential defect, nothing that Plaintiff has alleged indicates that knowledge of this design flaw necessarily would have resulted in non-payment by the Government. This is the very heart of an FCA claim and it is clear that Plaintiff lacks any personal knowledge of how or under what conditions the Government agreed to pay for the FMTVs. The nearest Plaintiff comes to explaining the actual delivery and payment of the FMTVs is his "belief" that:

> [T]he Defendant delivered to the Government approximately 5,000 FMTVs prior to implementation of the converter over-stroke problem (approximately 2,000 of which

19

Defendant delivered after discovery of the problem).  Compl. ¶ 46.  Each such FMTV contains the converter over-stroke design flaw that renders such vehicles potentially dangerous, and that makes it impossible for Defendant to certify that vehicles meet the FMVSS stopping-distance and lane-hold standards after maintenance.  *Id*.  In addition, every FMTV that Defendant delivered to the Government, both before and after the design change, suffers from the design flaw that permits excessive air to enter into the hydraulic chamber and brake line.  Compl. ¶ 47.  It is impossible for Defendant to certify that those vehicles will meet FMVSS stopping-distance and lane-hold standards after standard maintenance.  *Id*.  As a result, each FMTV that Defendant delivered to the Government is in violation of the contractual requirements that each vehicle [meet FMVSS standards].

(ECF No. 25, Pl.'s Resp. 12.)  Fatally absent from the allegations of the Complaint, and from Plaintiff's response to BAE's motion, is any assertion that the Government's payment for the FMTVs was expressly conditioned on BAE delivering FMTVs that were free of a design flaw that could interfere with the vehicle's brake system after the first standard maintenance was performed on the vehicle.  At most, Winkler alleges that BAE delivered vehicles that would be noncompliant with the contract specifications after their first maintenance.  While, if true, this may be the basis for a breach of contract claim by the Government against BAE, this is not the stuff of a FCA claim.  If it were, every breach of contract or bad faith performance of a contract that involved the Government as a party would form the basis for a claim under FCA.[3]  The law does not support such

---

[3] Winkler also suggests that in some unexplained way, BAE's conduct described in the Complaint violates certain Federal Acquisition Regulations ("FARs"), *see* 48 C.F.R. §§ 32.908(c) and 52.232-25(d).  The Court need not examine this allegation in detail as the sections on which Winkler purports to rely relate to "overpayments" which Winkler does not identify anywhere in the Complaint.  Additionally, Winkler appears to have abandoned reliance on the FARs as a basis for his claims given that he does not address BAE's argument regarding the inapplicability of the FARs in its motion.  In any event, the FARs in fact "permit the Government to seek a range of remedies in the event it receives noncompliant items from a contractor, including acceptance, price reduction or replacement."  *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F3d. 262, 269 (6th Cir. 2010).  The very availability of such remedies is evidence of the fact that compliance in such cases was not a precondition to payment.  "[T]he Government's ability to seek a range of remedies in the event of noncompliance suggests that payment is not conditioned on a certification of compliance.  That the government may accept (and pay) for noncompliant commercial items under the FAR

a broad reading of the FCA.  As the Sixth Circuit held in *Chesbrough*, under the implied false certification theory, "it is not the violation of a regulation itself that creates a cause of action under the FCA."  655 F.3d at 468.  "Rather, noncompliance constitutes actionable fraud [under the FCA] only when compliance is a prerequisite to obtaining payment.  Thus, a relator cannot merely allege that a defendant violated a standard - he or she must allege that compliance with that standard was required to obtain payment."  655 F.3d at 468.

While the System Specifications and federal guidelines on which Winkler relies do dictate certain standards that must be met in order to meet the contract specifications, none of the allegations submit that compliance with those specifications or statutory requirements was expressly made a condition to payment under the 2008 Contract.  As BAE points out, none of the System Specifications or statutory regulations on which he relies actually relates to the maintenance aspects of the brake system.  It is not alleged that the FMTVs as delivered were not in compliance with the relevant System Specifications or statutory regulations.  Only on their first needed maintenance, when air is introduced into the brake system, do the FMTVs become "non-conforming" as Plaintiff alleges.  As BAE points out, none of the System Specifications or statutory regulations on which Plaintiff relies even purport to regulate brake system maintenance.  There simply are no facts alleged in the Complaint that could support a finding that issues with the brake system maintenance procedures were so essential to the Government's decision to pay for the FMTVs that they would

_____

confirms that payment is not conditioned on compliance . . . . Were private litigants able to pursue FCA claims whenever the Government acquired noncompliant commercial items, the Government's ability to pursue the range of remedies contemplated by the FAR would be substantially compromised." *Id*. at 270.  The FCA was never intended to serve as a remedy for every delivery of noncompliant products under a government contract, but only when compliance as to that particular standard was expressly made a precondition to payment.

not have paid for the vehicles had they known that BAE was in the process of addressing issues with the proper protocols to be followed in standard maintenance of the brake system.   There were no certifications given, nor none implied, regarding the maintenance procedures for maintaining the proper operation of the FMTVs brake system.   Winkler has failed to allege a false claim.

### 2.      Winkler fails to adequately allege presentment.

Even assuming that Winkler could establish falsity based upon an implied false certification theory, the Complaint additionally fails adequately to allege the actual presentment of any false claim to the Government.   Winkler does not deny that he lacks any knowledge of the billing practices and procedures through which BAE would have actually billed the Government for the FMTVs under the 2008 Contract.   Likewise, he claims no personal knowledge of the provisions of the 2008 Contract that govern the delivery of and payment for the FMTVs, or of the parties' actual conduct in performance of those aspects of the contract.   Like the Chesbroughs, Winkler "lack[s] the personal knowledge of billing practices or contracts with the government . . . . [His] knowledge is limited to the allegedly fraudulent scheme." *Chesbrough*, 655 F.3d at 471-72. *Bledsoe*, *Marlar*, *Sanderson* and *SNAPP*, *supra*, dictate that Winkler's inability to identify a single actual claim is fatal to his FCA Complaint.

Winkler, however, again asking the Court to afford him the benefit of inference and innuendo, suggests that this element is satisfied in this case if the Court adopts and applies the "strong inference exception" that would permit the Court to draw an inference that false claims must have been presented and paid, despite Winkler's lack of personal knowledge that in fact these critical elements of his FCA claim occurred.   In urging this Court to embrace the "strong inference exception," Winkler relies on several cases, none of which offers substantial support for the Court's

22

application of that inference here.[4]

Most easily distinguished is *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 07-cv-4, 2010 WL 1926131 (E.D. Tenn. May 12, 2012). In *Lane*, the relator had been a billing specialist for the defendant and had personal knowledge of the physicians'

---

[4] BAE suggests that the Sixth Circuit has never "established or applied" the strong inference exception. (ECF No. 26, Def.'s Reply Br. 3.) This is not a fair statement. Indeed, although BAE states that *Chesbrough* only contained dicta on this issue and that "since that dicta, the Sixth Circuit has neither established such an exception or applied it," every case BAE cites in support of this statement was decided *before Chesbrough* and therefore each is distinctly unsupportive of this suggestion. BAE argues that the Sixth Circuit's discussion of the strong inference exception in *Chesbrough* was "just dicta," when in fact the court not only discussed the exception but at great length analyzed it and concluded that it did not apply on the facts of that case. The court in *Chesbrough* noted the fact that in *Bledsoe*, it had declined even to speculate about the possibility of relaxing the Rule 9(b) requirements in certain situations. 655 F.3d at 470-71. The court in *Chesbrough* then went on to discuss whether such relaxing of the Rule 9(b) requirements was called for in *Chesbrough*, noting that "such an inference may arise when the relator 'has personal knowledge that the claims were submitted by Defendants . . . for payment.'" *Id.* at 471 (citing *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 07-cv-4, 2010 WL 1926131, at *5 (E.D. Tenn. May 12, 2012) and *Marlar, supra*, 525 F.3d at 466.) Ultimately the court concluded that the Chesbroughs lacked the type of personal knowledge that would strongly support an inference that claims were submitted, concluding: "There may be other situations in which a relator alleges facts from which it is highly likely that a claim was submitted to the government for payment. But that, too, is not the case here." *Id.* The Sixth Circuit had every opportunity in *Chesbrough* to reject the strong inference exception but did not do so and in fact analyzed the case under that exception. In *United States ex rel. Elliott v. Brickman Group Ltd., LLC*, 845 F. Supp. 2d 858 (S.D. Ohio 2012), the court was called upon to decide, in the context of a motion to certify the issue for interlocutory appeal, "whether the "strong inference" exception mentioned, but not applied, by the Sixth Circuit in [*Chesbrough*], retains any vitality in the *qui tam* context." *Id.* at 867. In a lengthy discussion of the issue, the district court in *Elliott* concluded: "Defendant is incorrect where it states that no Sixth Circuit case has applied the strong-inference exception. *Chesbrough* itself applied the strong-inference exception. . . . The Sixth Circuit would not apply an exception that does not exist, as Defendant contends here. Rather, it applied the exception exactly because ignoring it would have been ignoring binding precedent." *Id.* at 869 (internal citation to the record omitted). This Court rejects BAE's suggestion that "no court in the Sixth Circuit has recognized the strong-inference exception." The Court concludes that the Sixth Circuit has embraced the strong-inference exception, that it requires a strong showing that the relator had personal knowledge that false claims were submitted, but finds, as discussed *infra*, that the facts of this case do not warrant its application here.

23

certifications to the government in the bills that she processed.  This is a far cry from Winkler's alleged involvement in endeavoring to engineer a fix for the allegedly defective brake system in the case *sub judice*.  Even assuming the truth of Winkler's allegations regarding his familiarity with the details of the alleged fraud on the government, Winkler professes no knowledge whatsoever regarding the requests for payment actually submitted to the government for the FMTVs and certainly professes no knowledge of any "certifications" that may have accompanied those billings. Winkler, in short, is nothing like Lane.  *Lane* does not support Winkler's attempt to apply the strong inference exception where, as here, the relator admittedly has no personal knowledge whatsoever regarding the billing practices or actual presentment of allegedly false certifications.  Similarly distinguished is *United States ex rel. Yanity v. J&B Med. Supply Co*., No. 08-11825, 2012 WL 1247163, at *1 (E.D. Mich. April 13, 2012) ("As employees within the Defendant's billing department, the Plaintiffs contend that they were in a position to review all of their employer's billing records which, in turn, enabled them to uncover numerous instances of false billing to Medicaid.")

Plaintiff's reliance on *United States ex rel. McDonough v. Symphony Diagnostic Services, Inc.*, No. 08-cv-00114, 2012 WL 628515 (S.D. Ohio Feb. 27, 2012) is likewise misplaced.  In that case, the district court expressly distinguished *Chesbrough* in finding that the complaint in *McDonough* warranted a "relaxing" of the presentment requirement.  In *McDonough*, unlike *Chesbrough* and unlike the case *sub judice*, the relator alleged personal knowledge of certifications of compliance that were made to the Government as to regulations that required compliance as a precondition to payment by the Government.  Distinguishing *Chesbrough*, the district court found sufficient factual matter to support a strong inference that false claims were submitted:

24

This Court is of the opinion that, unlike the plaintiffs in *Chesbrough* itself, the Plaintiff's Amended Complaint here warrants just such a "relaxing" of the specific claim requirement. The Amended Complaint contains well-pleaded particularities drawn from Plaintiffs' personal experience that, collectively, support a strong inference that Mobilex submitted claims pursuant to the swapping scheme that Plaintiff alleges, and thus, would have been fraudulent. *See id.* at 467 ("When a claim expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply would render the claim fraudulent."). While no specific claim is identified, specific representative examples of the swapping scheme at issue are identified, and in this case that is enough to satisfy the particularity requirements of Rule 9(b).

\*                    \*                    \*

Plaintiff's Amended Complaint is distinguishable from the Chesbrough's because [] the Mobilex and the SNFs with which it contracts expressly certify that the submitted claims for reimbursement are not fraudulent. The major failure of the Chesbrough's complaint of fraud was its inability to identify when or where the allegedly deficient providers had certified that their services would comply with a higher standard. *See Chesbrough*, 655 F.3d at 468 ("Although the Chesbroughs allege that VPA failed to meet 'objective standards' for testing, they do not allege that VPA was expressly required to comply with those standards as a prerequisite to payment of claims.") On the contrary, here Plaintiff asserts that Mobilex certified, to the government, its compliance not just with the Anti–Kickback statute and Stark laws, but also the Corporate Integrity Agreement. FAC ¶¶ 28, 59–61. Plaintiff alleges that under these certifications, compliance with the Anti–Kickback statute and other applicable laws and regulations "was required to obtain payment" from the government. Thus, any bills or claims submitted to the government thereafter, such as those referenced in Exhibit 1 to the Amended Complaint, would be fraudulent if Mobilex offered SNFs discounted Part A services in exchange for Part B referrals, as alleged.

2012 WL 628515, at \*8-9. Thus, unlike the relator in *McDonough*, Winkler has no personal knowledge of any certifications that were made, let alone certifications that were required to be made, in order to obtain payment. For the same reason that Winkler's claims fail to support a theory of liability based upon an implied false certification, they also fail to support entitlement to a strong inference exception to the rule of actual presentment.

Similarly, in *United States ex rel. Cox v. Smith & Nephew, Inc.*, 749 F. Supp. 2d 773 (W.D. Tenn. 2010), the relator was a former executive at Smith & Nephew who had personal knowledge,

based upon his participation in the company's investigations into the false designation of the origin of certain Smith & Nephew products, of the fact that Smith & Nephew was violating the federal procurement laws and that the company had falsely certified its compliance with those laws. "Relator's allegations are even less speculative because they are based on his first-hand knowledge as an executive with Smith & Nephew—an executive who was, for a time, tasked by Smith & Nephew with investigating falsely designated products and who allegedly had other executives admit to him that Smith & Nephew was engaged in violations of federal procurement law." *Id.* at 785. By contrast, Winkler claims to have intimate knowledge of the alleged defect in the brake system after maintenance and of BAE's alleged non-disclosure of that issue to the government. Winkler claims no personal knowledge that in any way relates to BAE's certification of compliance with any controlling regulations or standards relating to the alleged defect that could lead to a strong inference that BAE presented false claims for payment.

Finally, Winkler relies on the Sixth Circuit's opinion in *United States ex rel. Varljen v. Cleveland Gear Co.*, 250 F.3d 426 (6th Cir. 2001). In *Cleveland Gear*, the relators had a contract with the Department of Defense to build 400 winches. The relators subcontracted with Cleveland Gear to produce worm gears to include in the winches. According to the relator, under the subcontract with Cleveland Gear, Cleveland Gear was obligated to notify the relators if any changes in manufacturing would affect the fit, function or service life of the worm gears. *Id.* at 428. Government inspection of all gears was required before the gears left Cleveland Gear's parts plant. *Id.* The relators alleged that Cleveland Gear changed the manufacturing process after approval of an initial batch and that change violated contract specifications. *Id.* at 429. The Sixth Circuit was not called upon to address at all the issues presented in this case because "[i]t [was] undisputed that

26

Cleveland Gear caused to be submitted a "claim" to the government." *Id*. at 431.  Rather, the case involved the issue of whether the relators had to allege any injury to the United States.  *Varljen*, thus, is unhelpful to Winkler on the sufficiency of his Complaint to adequately plead a false claim and presentment.

While the Sixth Circuit has embraced the implied false certification theory and the strong inference exception, it has likewise never backed away from the bedrock principle that an actual false claim presented to the Government is the *sine qua non* of a claim under the FCA.  *See United States ex rel. Dennis v. Health Management Assoc., Inc.*, No. 09-00484, 2013 WL 146048, at *12, 16 (M.D. Tenn. Jan. 14, 2013) (refusing to apply the implied false certification theory or the strong inference exception where (1) compliance with the underlying law allegedly violated was not a prerequisite to payment and (2) where the relator failed to allege facts demonstrating first-hand knowledge or involvement with defendants' billing and claim submission process).  Even giving Winkler's Complaint the benefit of both the false implied certification theory and the strong inference exception, Winkler's Complaint pleads no facts that would suggest that any of the Rule 9(b) standards should be relaxed in this case.  The Complaint fails to state a claim under the presentment provision of the FCA.

**B.    Winkler's Complaint Alleging Violations of the False Statement (§ 3729(A)(1)(B)), Conspiracy (§ 3729(A)(1)(C)) and Reverse False Claims (§ 3729(A)(1)(G)) Provisions Similarly Fails to Plead Those Claims with Sufficient Particularity.**

Winkler argues that under these remaining sections of the FCA, he need not plead that the allegedly false claims were actually presented to the Government.  First, the lack of a presentment requirement in section (a)(1)(B), (C) and (G) does not affect the Court's conclusion that Winkler has failed to establish a false claim under his suggested implied false certification theory.  No one

27

disputes that a false or fraudulent misrepresentation is as much a requirement under (1)(B), (C) and (G) as it is under (1)(A).  *See Marlar*, 525 F.3d at 447 (noting that while "proof of "presentment" is not required for actions under subsections (a)(2) and (a)(3), we have repeatedly held that proof of a false claim is required") (internal citation omitted).  For this reason alone, Winkler's claim under § 3729(a)(1)(B) fails.

> **1.  Winkler fails to plead a false statement claim under § 3729(a)(1)(B)**

Section 3729(a)(1)(B) (pre-FERA § 3729(a)(2)) plainly seeks to address a situation not presented by the facts alleged in Winkler's Complaint.  That subsection attempts to capture the conduct of third parties (for example a subcontractor) who make false statements to some entity that are material to the government's decision to pay a claim.  As the Sixth Circuit recognized in *Chesbrough*, a relator cannot skirt the presentment requirement in § 3729(a)(1)(A) by simply pleading the same claim under the false statement section of the FCA:

> The Chesbroughs attempt to skirt *Bledsoe's* requirement by alleging violations of § 3729(a)(2), (7). They argue that, even if actual false claims must be identified in an action under § 3729(a)(1), "there is no requirement of presenting a claim to the Government" for actions pursuant to § 3729(a)(2), (7). For support, they cite *Allison Engine*, in which the Supreme Court explained, "What § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" 553 U.S. at 671, 128 S.Ct. 2123.
>
> But the Chesbroughs' argument misses the Supreme Court's point in *Allison Engine*. The case addressed the possibility that, rather than presenting a claim to the government itself, a defendant might instead be a subcontractor who "submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Id*. at 671, 128 S.Ct. 2123. Thus, the fact that "presentment" is not required for a § 3729(a)(2) claim does not relieve the Chesbroughs of the need to plead a connection between the alleged fraud and an actual claim made to the government.

655 F.3d at 472-73.  Winkler fails to plead this connection here.

In support of his claim under § 3729(A)(1)(B), Winkler relies on *United States ex rel.*
*Howard v. Lockheed Martin Corp.,*499 F. Supp. 2d 972 (S.D. Ohio 2007). Winkler argues that
*Howard* is the case that most resembles the facts in the case *sub judice*, and in some respects this
is a fair statement. *Howard* involved the relators' claims, set forth in a 400+ paragraph complaint,
that Lockheed and its subcontractors improperly billed the United States for nonconforming and
substandard tooling. The relators admitted that they did not have access to, and therefore could not
plead, specific or detailed facts concerning the subcontractors' invoices to Lockheed or Lockheed's
billings to the United States. The relators based their allegations about the submission of claims
upon "information and belief" derived from the relators' personal knowledge and combined 140
years of experience working at Lockheed and with the defendant subcontractors. *Id*. at 974-75. The
relators in *Howard* identified specific contracts by number, described the cost-plus nature of the
contracts by which Lockheed invoiced the United States, provided examples of specific tools for
which the United States was improperly overcharged, alleged the dollar amount of the overcharge
in many cases and identified management level employees who were aware of or participated in the
fraudulent schemes. *Id*. at 979. Further, relators identified the difficulties of accessing additional
information because several outside vendors had destroyed records. *Id*. This level of detail is
notably absent from Winkler's Complaint.

More importantly, however, as Winkler himself observes, the court dismissed the relators'
presentment claim in *Howard* and never discussed the strong inference exception. The court denied
the motion to dismiss the false statement and conspiracy claims, however, because *Howard* involved
claims against Lockheed and its subcontractors and consequently § 3729(A)(1)(B) was logically in
play. The court in *Howard* relied heavily on the Sixth Circuit's opinion in *United States ex rel.*

*Sanders v. Allison Engine Co., Inc.,* 471 F.3d 610 (2006).  The Sixth Circuit's opinion in *Allison Engine*, however, was later reversed by the Supreme Court in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).  The Supreme Court's decision in *Allison Engine* was later addressed by Congress's 2009 FERA amendments to the FCA, as recognized by the Sixth Circuit in *Chesbrough*:

> In 2009, Congress passed the Fraud Enforcement and Recovery Act, Pub.L. No. 111–21, 123 Stat. 1617 (2009), which renumbered the provisions at issue in this case as § 3729(a)(1)(A), (B), and (G). We refer to the sections as they were numbered at the time the Chesbroughs filed their action. The language of § 3729(a)(2) was amended, but the change has no impact on the issue in this appeal. It now reads: "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(B) (emphasis added). The deletion of the words "to get" likely responded to the Supreme Court's decision in *Allison Engine Co., v. United States ex rel. Sanders*, 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008), holding that § 3729(a)(2) contained an intent requirement—and thus required that a subcontractor who submitted a false statement to a prime contractor must intend that the statement be used "to get" the government to pay a claim.  By striking the words "to get," Congress eliminated that requirement. S.Rep. No. 111–10, at 11 (2009). Here, because there is no issue as to VPA's purpose in submitting claims for allegedly defective studies, we need not decide whether the new language applies to the Chesbroughs' claim. *See United States ex rel. SNAPP, Inc. v. Ford Motor Company*, 618 F.3d 505, 514 (6th Cir. 2010) (" SNAPP II ") (noting that it is "unsettled" whether the change applies retroactively).

655 F.3d 466 n. 2.[5]  Here, as in *Chesbrough*, there is no subcontractor involved and no question regarding the purpose of submitting claims for payment from the Government for the FMTVs.  While *Howard* also involved claims regarding allegedly false claims directly made by Lockheed to the United States, and thus on this point appears indistinguishable, *Howard* was decided before

---

[5]   Subsequently on remand, in *Sanders* and *United States v. Allison Engine Co., Inc.*, 703 F.3d 930 (6th Cir. 2012), the Sixth Circuit held that retroactive application of the FERA amendments did not violate the ex-post facto clause where the claim was pending on the effective date of the amendments.  There appears to be no question of retroactive application in this case as all of the conduct post-dates the effective date of the FERA amendments.

*Chesbrough*, before the Supreme Court reversed the Sixth Circuit in *Allison Engine*, and before Congress addressed the *Allison Engine* decision in its FERA amendments to the FCA and clarified that presentment was not required under the false statement provision of the FCA but materiality was.  *See Sanders and the United States v. Allison Engine Co.*, 703 F.3d 930, 932 (6th Cir. 2012) (noting that in the FERA amendments "Congress specifically amended the liability standards then set forth in § 3729(a)(2) of the FCA in order to remove the presentment requirement imposed by the Supreme Court's decision [in *Allison Engine*].")  As the Sixth Circuit noted in *Chesbrough* in denying the relators' claim under the false statement provision, however, "the fact that "presentment" is not required for a § 3729(a)(2) claim does not relieve the [relator] of the need to plead a connection between the alleged fraud and an actual claim made to the government."  Winkler fails to plead such a connection in the instant case.

### 2.      Winkler fails to plead a conspiracy claim under § 3729(a)(1)(C)

Winkler's failure to sufficiently plead a violation of §§ 3729(a)(1)(A) or (B) necessitates a finding of a failure to plead a conspiracy to violate those sections under § 3729(A)(1)(C).  In any event, Winkler's Complaint only mentions the conspiracy provision in the title of one-count and never pleads even the bare bones facts, let alone the specific facts, that are required under the statute to state a conspiracy claim, such as who conspired to violate subsections (A) or (B) or what acts were taken in furtherance of the conspiracy and when.  Other than identifying the conspiracy section in the title of the Count, Winkler never mentions the conspiracy claim or attempts to plead any facts in support of such a claim.  These conclusory allegations fail to meet the pleading standards in this case.  *See Dennis*, 2013 WL 146048, at *17 ("Rule 9(b)'s heightened pleading standard applies to FCA claims of conspiracy to defraud the government. . . . [and] [u]nder Rule 9(b), general

allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action.").

### 3.     Winkler fails to plead a reverse false claim under § 3729(a)(1)(G)

Similarly, Winkler's claim under section 3729(a)(1)(G), his "reverse false claim," is only referenced in the title of his one-count Complaint.  "A claim under this provision is called a "reverse" false claim because the action of the defendant results not in improper payment to the defendant from the government, but rather no payment (or reduced payment) to the government when payment is otherwise obligated."  *Dennis*, 2013 WL 146048, at *18.  No effort to develop the factual basis for this claim, which requires at least an allegation that the defendant owed the government a debt at the time of the alleged false statement, appears in the Complaint.  Nor does Winkler endeavor to develop this claim in his response to BAE's motion.

## IV.   CONCLUSION

Winkler alleges in great detail how in his view the FMTV brake system would fail to meet certain contract specifications after first undergoing standard maintenance and alleges that BAE attempted to hide this potential defect from the Government.  What the Complaint does not allege, and what dooms Winkler's claims under the FCA, is a single factual averment that any of the specifications or federal guidelines related to the performance of the FMTVs after their first scheduled maintenance or that any such specifications were incorporated into the 2008 Contract or that BAE's compliance with any of these specifications or standards relating to the brake system was a prerequisite to payment for the FMTVs under the 2008 Contract.

Accordingly, the Court concludes that Winkler has failed to adequately plead a violation of

the FCA. The Court therefore GRANTS BAE's motion and DISMISSES Winkler's Complaint.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: July 15, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 15, 2013.

s/Deborah Tofil
Case Manager

33